J-S42010-24          2025 PA Super 137

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| KAREEM MOHAMMED WILLIAMS JR. | : | |
| | : | |
| Appellant | : | No. 182 MDA 2024 |

Appeal from the Judgment of Sentence Entered January 3, 2024
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002933-2023

BEFORE:  LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

OPINION BY LAZARUS, P.J.:                              **FILED: JULY 1, 2025**

Kareem Mohammed Williams, Jr., appeals from the judgment of sentence, entered in the Court of Common Pleas of York County, after the court found him guilty of possessing a firearm without a license[1] following a stipulated bench trial.  After review, we affirm.[2]

---

[1] **(a) Offense defined.--**

(1)    Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

18 Pa.C.S.A § 6106(a)(1).

[2] Because the Supreme Court of the United States has declined to take up the question before us, **see Jacobson v. Worth**, --- S. Ct. ----, 2025 WL 1151242 (U.S. filed Apr. 21, 2025) (denying petition for writ of certiorari), we see it as particularly pressing to provide clarity on the issue under Pennsylvania law.

At a bench trial held on January 3, 2024, the parties stipulated to the following relevant facts:

1.   Defendant is Kareem Williams, Jr., DOB: 12/05/2003[,] and was nineteen (19) years old on April 18, 2023.

2.   On April 18, 2023, [O]fficer Tomas O'Brien of the Spring Garden Township Police Department initiated a traffic stop on a grey Ford Sedan bearing PA registration MCK8575 in the 1000 block of Boundary Avenue in York County.  []

3.   [Williams] was the front passenger in said vehicle and Officer O'Brien noticed that Williams was carrying a fanny/sling[-]type pack on his person.

4.   During the traffic stop, Officer [Samantha] Cumor asked [Williams] to get out of [the] vehicle and noticed [Williams'] fanny/sling[-]type pack on the front passenger floor of the vehicle.

5.   Officer Cumor asked [Williams] what was in his fanny/sling[-]type pack and [Williams] stated his pack contained a firearm.

6.   [Williams] did not have a concealed carry permit and could not legally obtain a concealed carry permit as he was under twenty-one (21) years of age.

7.   The firearm found in [Williams'] possession [] on April 18, 2023, was a Springfield XDS 9mm with serial number HG906743. Said firearm is functional and capable of discharging the type of ammunition for which it was manufactured.

8.   The firearm was loaded with eight (8) rounds of 9mm ammunition in the magazine and one round in the chamber.  []

Commonwealth's Exhibit 1, Stipulations of Fact for Bench Trial, 1/5/24.

Prior to trial, on September 12, 2023, Williams filed an omnibus pretrial motion arguing, inter alia, that the court should dismiss the charge for carrying

a firearm without a license because 18 Pa.C.S.A §§ 6106 and 6109[3] violate the Second Amendment of the United States Constitution and Article 1, Section 21 of the Pennsylvania Constitution as applied to Williams' conduct. *See* Omnibus Pretrial Motion, 9/12/23, at ¶¶ 40, 69. The court, relying on ***Commonwealth v. Jamison, et. al.***, Docket No. CP-67-CR-4208-2022 (York Ct. Com. Pls., en banc, Oct. 31, 2023), an en banc decision by the Court of Common Pleas of York County addressing similar challenges to 18 Pa.C.S.A § 6105,[4] denied Williams' omnibus pretrial motion. *See* N.T. Omnibus Pretrial Motion Hearing, 11/9/23, at 3; *see also* Trial Court Opinion, 3/20/24, at 2.

Based on the above-recited stipulations, the court found Williams guilty of one count of carrying a firearm without a license and sentenced him to two-and-a-half to five years' incarceration and the costs of prosecution, with 260 days' credit for time served.[5] *See* Order, 1/3/24. Williams filed a timely appeal.

---

[3] Pennsylvania's licensing statute provides that "[a]n individual who is 21 years of age or older may apply to a sheriff for a license to carry a firearm concealed on or about his person or in a vehicle within this Commonwealth." 18 Pa.C.S.A. § 6109(b).

[4] 18 Pa.C.S.A § 6105 is Pennsylvania's "persons not to possess" statute, which delineates what prior convictions bar an individual from, inter alia, possessing a firearm.

[5] The court expressly found Williams not guilty of the second charged offense of possession of a controlled substance (marijuana), 35 P.S. § 780-113(a)(31)(i). *See* N.T. Nonjury Trial, 1/3/24, at 3. Accordingly, while Williams raised an issue relating to the drug offense on appeal, it is moot.

The trial court and Williams have both complied with Pa.R.A.P. 1925.

Williams raises the following claims on appeal:

1. The trial court erred when it denied [Williams' m]otion to [d]ismiss:

    a. The trial court heard no evidence and took no argument on [Williams'] motion, instead relying on [an] unrelated Court of Common Pleas en banc decision[ addressing] 18 Pa.C.S.[A.] § 6105, which [was] not relevant to [Williams'] case and to which [Williams] was not a party; [and]

    b. The Commonwealth presented no evidence or argument to sustain its burden of historical analogues for 18 Pa.C.S.[A.] § 6106 and § 6109 under the test set forth in [**New York State Rifle & Pistol Association, Inc.**] **v. Bruen**, 597 U.S. 1 [] (2022);

2. Sections 6106 and 6109 of the Crimes Code violate [Williams'] rights under the Second Amendment to the U.S. Constitution and Article I, Section 21 of the Pennsylvania Constitution:

    a. There is no historical tradition under the **Bruen** test of prohibiting 18[-]20-year-olds from carrying a firearm in public with or without a license, as required by 18 Pa.C.S.[A.] § 6109;

    b. There is no historical tradition under the **Bruen** test of prohibiting the possession of a firearm in a vehicle without a license, as required by 18 Pa.C.S.[A.] § 6106; [and]

    c. Article I, Section 21 of the Pennsylvania Constitution provides greater protection than the Federal Constitution on these issues.

Appellant's Brief, at 4-5 (reordered for ease of review; unnecessary capitalization omitted).

In Williams' first claim, he raises two sub-issues challenging the denial of his motion to dismiss, which we address separately. First, he argues that

- 4 -

the court erred by not taking evidence or hearing argument on the **Bruen** claim raised in his omnibus pretrial motion, but, instead, relying on **Jamison**. **See** Appellant's Brief, at 16–17.

Williams' claim fails as Pennsylvania Rule of Criminal Procedure 577 permits a trial court to rule on such a motion based on the filing alone. **See** Pa.R.Crim.P. Rule 577. Specifically, Rule 577 states the following:

**(A)** Following the filing of a motion,

(1) if the judge determines an answer is necessary, the court may order a written answer, or it may order an oral response at the time of a hearing or argument on a motion. []

(2) if the judge determines the motion requires a hearing or argument, the court or the court administrator shall schedule the date and time for the hearing or argument. []

Pa.R.Crim.P. 577(A)(1), (2). The rule's language makes clear that a trial court may decide whether a hearing or additional evidence is necessary to rule upon a motion. **See Commonwealth v. Cernick**, 272 A.3d 476, at *2 n.3 (Pa. Super. 2022) (Table)[6] ("Rule 577(A)(2) confers general discretion to a trial court to determine whether a hearing is required upon the filing of any motion."). Therefore, the trial court did not err in ruling on Williams' motion, and he is afforded no relief on this claim.

Williams next contends that the trial court erred in relying on an "unrelated" en banc Court of Common Pleas of York County decision.

---

[6] **See** Pa.R.A.P. 126(a)-(b) (unpublished, non-precedential opinions of this Court, filed after May 1, 2019, may be cited for persuasive value).

Appellant's Brief at 16. Williams asserts that this was error because the en banc decision dealt with a different section of the criminal code than the one he was charged with—section 6105 instead of section 6106—and because a trial court may not consider evidence outside of the record in making its determination. *See* Appellant's Brief, at 16-17, citing *Ney v. Ney*, 917 A.2d 863 (Pa. Super. 2007). Williams' claim is belied by the record.

In its opinion, the trial court relies only in part on *Jamison*: "namely[,] the jurisdictional points and decision with respect to whether Pennsylvania law affords greater protection than federal law for firearms licensure remain directly applicable to this case." Trial Court Opinion, 3/20/24, at 2.; *see also Jamison*, at 8–9 ("There is not a single case to support the argument that the Pennsylvania Constitution offers greater protection with respect to firearms ownership and possession than the Second Amendment."). It also relied on *Bruen*, a recent decision by the Supreme Court of the United States considering a Second Amendment challenge, discussed further *infra*. *Id.* Furthermore, while Williams relies on *Ney* to claim that a trial court may not rely on evidence outside of the record, *Ney* dealt with a judge who relied upon his own internet job search in making a ruling—a far cry from a judge citing to an en banc decision by the court it sits on as persuasive legal reasoning. *See Ney*, 917 A.2d at 868. Accordingly, the trial court did not err in relying, in part, on *Jamison*, and Williams is entitled to no relief.

Williams' next claims that the trial court erred in denying his motion to dismiss because the Commonwealth failed to meet its burden under the

- 6 -

***Bruen*** test.  ***See*** Appellant's Brief at 18.  Williams' position is that it was "the Commonwealth's burden to show the challenged statute is consistent with traditional firearm regulations."  ***Id.***

This claim is unavailing because Williams waived this argument by failing to properly preserve it.  "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."  Pa.R.A.P. 302(a).  At the hearing on Williams' omnibus pretrial motion, when the trial court denied his motion, he did not raise an objection on the basis that the Commonwealth had not met its burden.  ***See*** N.T. Omnibus Pretrial Motion Hearing, 11/9/23, at 3;[7] ***see also Interest of N.B.***, 260 A.3d 236, 243 (Pa. Super. 2021) ("Failure to timely object to a basic and fundamental error will result in waiver of that issue.") (citation omitted).

In his second argument, Williams raises three sub-issues, which we address separately.  First, Williams argues that sections 6106 and 6109 are unconstitutional as applied to him under the Federal and Pennsylvania Constitutions.  ***See*** Appellant's Brief, at 21, 40.  Williams' Second Amendment challenge asserts that his conduct—carrying a firearm in a vehicle—was akin to carrying a gun for self-defense outside the home and, therefore, according

---

[7] Even if Williams had not waived this issue, his claim would still be without merit.  As discussed ***supra***, Rule 577 permits trial court judges to rule on motions based on the moving party's filing alone.  ***See*** Pa.R.Crim.P. 577. Therefore, the trial court did not err in denying Williams' motion to dismiss without briefing from the Commonwealth because, while it had discretion to seek a response from the Commonwealth, it was not required to do so and was permitted by rule to deny Williams' motion without further briefing. ***See Cernick***, ***supra***.

to **Bruen**, is "protected conduct under the Second Amendment." **Id.** at 18. Williams argues that, because his conduct is protected under the Second Amendment, under **Bruen**, it becomes the Commonwealth's burden to "show the challenged statute is consistent with traditional firearm regulations[.]" **Id.** He claims that doing so would require the Commonwealth to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." **Id.**

Regarding section 6109, Williams points to the decision of the United States Court of Appeals for the Third Circuit in **Lara v. Evanchick**,[8] 91 F.4th 122 (3rd Cir. 2024), *cert. granted*, judgment vacated *sub nom.*, **Lara v. Commissioner Pennsylvania State Police**, 125 F.4th 428 (3d Cir. 2025), in support of his claim that "there is no basis to find that 18-to-20-year-olds are not part of [`]the people[']￼ in the Second Amendment."[9] Appellant's Brief, at 38–40. In this section of his brief, Williams primarily summarizes the

_____

[8] We refer to this case as **Lara v. Evanchick**, as Williams did, to avoid confusion with **Lara v. Commissioner Pennsylvania State Police**, 125 F.4th 428 (3d Cir. 2025) ("**Lara**"), a different opinion from the same litigation.

[9] The appellee in **Evanchick**, the Commissioner of the Pennsylvania State Police, petitioned to the Supreme Court of the United States for writ of certiorari from that ruling. The writ was granted, the judgment vacated, and the case was remanded to the Third Circuit for further consideration in light of **United States v. Rahimi**, 602 U.S. 690 (2024). Thereafter, the Third Circuit reached the same conclusion in **Lara** that it did in **Evanchick**. That said, neither case is binding on this Court. **See Werner v. Plater-Zyberk**, 799 A.2d 776, 782 (Pa. Super. 2002) (providing federal court decisions other than those of United States Supreme Court not binding on this Court).

government's argument in **Evanchick** and the Third Circuit's reasons for rejecting those arguments. **See id.**

The Commonwealth's response to Williams primarily rests on its argument that, because 18-to-20-year-olds were treated as "infants," i.e., minors or non-adults, with limited political and civil rights at the time of the founding, it is not against our nation's history and tradition of firearm regulation to curtail their access to firearms now. **See** Commonwealth's Brief, at 21-27. The Commonwealth points to the fact that, at the time of the founding, minors did not have the ability to go to court to seek vindication of their rights and had a legal status similar "to that of married women under the doctrine of coverture under common law."[10] **See id.** at 22. When the Second Amendment was ratified, minors aged 18 to 20 could not vote or serve on juries, enter into most contracts, or collect debts owed to them except through a legal guardian. **See id.** at 22–23, citing Megan Walsh and Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms*, *1791-1868*, 108 MNLR 3049, 3056-57 (June 7, 2024). Further, the Commonwealth notes that when minors attended college, the school acted in loco parentis and often prohibited guns on and even off campus. **See** Commonwealth's Brief, at 23.

---

[10] "[T]he husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs every[]thing[.]" 1 Blackstone, Commentaries, at 441.

The Commonwealth dedicates a significant portion of its brief to attempting to rebut Williams' argument regarding 18-to-20-year-olds being mandated to serve in state militias at the time of the founding. *See id.* at 24-26. One component of the Commonwealth's argument is the distinction between a "right" and an "obligation." *See id.* at 25. To illustrate, while citizens today have "a duty to participate in jury service," they do not have "a right to be chosen to serve on a jury." *See id.*, citing Walsh and Cornell, *supra*, at 3077. It follows, according to the Commonwealth, that it is error to assume that because an 18-year-old in 1792 could have been legally obliged to serve in a militia and bear arms as a part of that service, he had a corresponding right to bear arms outside of and independent from that obligatory service. *See* Commonwealth's Brief, at 25. The Commonwealth also posits that minors required to serve in a militia were not expected to arm themselves for service; instead, it was commonly understood that their parents, guardians, or the local government or state would provide them with arms. *See id.* at 25-26. Therefore, according to the Commonwealth, a "regulation that limits licenses to carry concealed [weapons] . . . is consistent with this nation's historical tradition." *See id.* at 26.

A challenge to the constitutionality of a statute presents a pure question of law for which our standard of review is de novo and our scope of review is plenary. *See Commonwealth v. Farmer*, 329 A.3d 449, 451 (Pa. Super. 2024). Wiliams, as the party challenging the constitutionality of a statute, carries the "high burden" of demonstrating it "clearly, palpably, and plainly"

violates the Second Amendment. *See Commonwealth v. McIntyre*, 333 A.3d 417, 426 (Pa. Super. 2025), citing *Commonwealth v. Omar*, 981 A.2d 179, 185 (Pa. 2009).

The Supreme Court of Pennsylvania has only once taken up a challenge to a firearm regulation under the *Bruen* test. *See Barris v. Stroud Township*, 310 A.3d 175 (Pa. 2024). *Barris* was decided before the Supreme Court of the United States announced its decision in *United States v. Rahimi*, 602 U.S. 680 (2024), wherein it expanded upon its decision in *Bruen* and attempted to clarify how lower courts are to apply the *Bruen* test.[11] *See Rahimi*, 602 U.S. at 690–702. We will, therefore, attempt to synthesize the Supreme Court of Pennsylvania's decision in *Barris* with *Rahimi*'s updated guidance on applying *Bruen*.

_____

[11] Justice Ketanji Brown Jackson's concurrence in *Rahimi* acknowledged the difficulty lower courts had applying *Bruen*, stating:

> The message that lower courts are sending now in Second Amendment cases could not be clearer. They say there is little method to *Bruen*'s madness. It isn't just that *Bruen*'s history-and-tradition test is burdensome (though that is no small thing to courts with heavier caseloads and fewer resources than we have). The more worrisome concern is that lower courts appear to be diverging in both approach and outcome as they struggle to conduct the inquiry *Bruen* requires of them. Scholars report that lower courts applying *Bruen*'s approach have been unable to produce "consistent, principled results," and, in fact, they "have come to conflicting conclusions on virtually every consequential Second Amendment issue to come before them[.]" Given this, it appears indisputable that, after *Bruen*, "confusion plagu[es] the lower courts."

*See Rahimi*, 602 U.S. at 742–43 (Jackson, J., concurring) (citations omitted).

The United States Supreme Court has reiterated that "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 602 U.S. at 690, citing *McDonald v. Chicago*, 561 U.S. 742, 778 (2010). "Like most rights, though, the right secured by the Second Amendment is not unlimited." *Rahimi*, 602 U.S. at 690, citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (internal quotations omitted). When a statute is challenged under the Second Amendment, *Bruen*'s standard is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Barris*, 310 A.3d at 203, quoting *Bruen*, 597 U.S. at 24.

Analyzing a Second Amendment challenge entails considering "whether the challenged regulation is consistent with the principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692, citing *Bruen*, 597 U.S. at 26–31. It is the Commonwealth's burden to show that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 689, quoting *Bruen*, 597 U.S. at 24. We must then determine whether the Commonwealth has proven that the regulation is "relevantly similar to laws that our tradition is understood to permit, apply[ing] faithfully the balance struck by the founding generation to modern

circumstances." ***Rahimi***, 602 U.S. at 692, quoting ***Bruen***, 597 U.S. at 29 (internal quotations omitted).

One method we can employ to determine whether historic and modern regulations are "relevantly similar" is by looking at the "how and why" behind the regulations, i.e., whether the regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" ***Barris***, 310 A.3d at 185–86, quoting ***Bruen***, 597 U.S. at 29; ***Rahimi***, 602 U.S. at 692 ("Why and how the regulation burdens the right are central to this inquiry."). The analysis does not require a "historical twin" or "dead ringer[;]" instead, the Commonwealth can point to "well-established and representative historical analogue[s]" to show that the regulation is sufficiently analogous. ***Barris***, 310 A.3d at 186, quoting ***Bruen***, 597 U.S. at 30.

Furthermore, the High Court's Second Amendment precedents do not render our jurisprudence "trapped in amber." ***Rahimi***, 602 U.S. at 691. Just as the Second Amendment's protection "extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence[ at the founding,]" so too does it permit "more than just those regulations identical to ones that could be found in 1791." ***Id.*** at 691–92, quoting ***Heller***, 554 U.S. at 582. That said, while we do not need a "historical twin" to deem a regulation constitutional, we "must be careful not to read a principle at such a level of generality that it waters down the right." ***Rahimi***, 602 U.S. at 740 (Barrett, J., concurring).

In ***Evanchick***, the appellee provided evidence that, at the time of the founding,[12] individuals younger than 21 were "infants" in the eyes of the law and thus not part of "the people" protected by the Second Amendment. ***See Evanchick***, 91 F.4th at 131–32. The United States Court of Appeals for the Third Circuit rejected those arguments because it held that: (1) it did not need to examine the first step of the ***Bruen*** analysis—figuring out whether the appellant is part of "the people" protected by the Second Amendment—through the retrospective "historical analogue" test of the second step; (2) the fact that those under 21 years of age lacked certain legal rights at the time of the Second Amendment's ratification did not, ipso facto, mean that they were not under the umbrella of "the people;" and (3) because 18-to-20-year-olds were among the people protected by other constitutional rights, it would follow that they are within the ambit of "the people" protected by the Second Amendment. ***See id.*** Additionally, the Third Circuit juxtaposed what it characterized as a "conspicuously sparse record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification" with the Second Militia Act of 1792, which "required all able-bodied men to enroll in the militia and to arm themselves upon turning 18." ***See id.*** at 136, citing Second Militia Act of 1792 § 1, 1 Stat. 271 (1792).

---

[12] We use "the founding" and "founding-era" interchangeably to refer generally to the period of time prior to and shortly after the adoption of the Constitution of the United States in 1789 and the adoption of the Bill of Rights in 1791. ***See Bruen***, 597 U.S. at 109 (referring to "founding-era texts from between 1760 and 1799) (Breyer, J., dissenting).

- 14 -

In ***Rahimi***, the United States Supreme Court considered a ***Bruen*** challenge to 18 U.S.C.A. § 922(g)(8), a law that, inter alia, prohibited individuals subject to a domestic violence restraining order from possessing a firearm.[13] ***See Rahimi***, 602 U.S. at 684, 692. While the High Court was not presented with "a founding-era or Reconstruction-era law that specifically disarmed domestic abusers," it nonetheless upheld the constitutionality of the law in an as-applied challenge based upon surety laws[14] and restrictions on "going armed."[15] ***See id.*** at 702; ***see also id.*** at 704 (Sotomayor, J., concurring). These laws provided a historical tradition of disarming individuals who "pose a credible threat to the physical safety of another." ***Id.*** The High Court reasoned that "[t]aken together, the surety and going[-]armed laws confirm what common sense suggests: When an individual poses a clear

_____

[13] 18 U.S.C.A. § 922(g)(8) made it unlawful to possess a firearm for a person who was subject to a court order including a finding that "such person represents a credible threat to the physical safety of such intimate partner or child." ***See*** 18 U.S.C.A. § 922(g)(8)(c)(i).

[14] Described by the High Court as a "form of 'preventive justice,'" surety laws authorized magistrates to require an individual suspected of future misbehavior to post a bond. If the individual were to fail to post a bond or posted the bond and thereafter broke the peace, they risked being jailed or forfeiting the bond. ***See Rahimi***, 602 U.S. at 695–97, quoting 4 Blackstone, Commentaries, at 251 (1787). Founding-era surety laws also targeted the misuse of firearms, requiring individuals who went armed to post bonds. ***See id.*** at 696.

[15] These laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land." ***Id.*** at 697, citing 4 Blackstone, Commentaries, at 148–149 (1769).

- 15 -

threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.

Here, we conclude that section 6109 is consistent with the nation's historical tradition of firearm regulation.[16]  To begin, under the *Bruen* analysis,[17] we have little trouble in saying that Williams' conduct, carrying a firearm in a vehicle, is protected by the Second Amendment.  *See Bruen*, 597 U.S. at 32 (reasoning text of Second Amendment encompasses public carrying of firearms).

Turning to the second step, it becomes the Commonwealth's burden to "justify its [regulation] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Barris*, 310 A.3d at 208, citing

---

[16] Our review took us outside the scope of the historical regulations cited to by the Commonwealth in its brief.  However, it "is well settled that where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself." *Commonwealth v. Lehman*, 275 A.3d 513, 520 n.5 (Pa. Super. 2022).

[17] In *Barris*, the Pennsylvania Supreme Court took up the "preliminary matter[]" of determining whether the petitioner is part of "the people" protected by the Second Amendment.  *See Barris*, 310 A.3d at 204.  The *Bruen* opinion spent little time on this issue and provided no test to conduct, nor elements or factors to consider, while the *Rahimi* majority opinion makes no mention of it.  *See Bruen*, 597 U.S. at 31–32 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *see Rahimi*, 602 U.S. at 690–702 (omitting preliminary step of determining whether petitioner was a part of "the people" protected by the Second Amendment).  Here, we will not rule on this issue because we lack proper guidance, from either the Supreme Court of the United States or the Pennsylvania Supreme Court, on how to conduct the inquiry, and because it is immaterial to our ultimate decision.

***Bruen***, 597 U.S. at 24. The Commonwealth has presented evidence of a historical tradition of individuals aged 18-to-21 being prohibited from possessing firearms. ***See*** Commonwealth's Brief, at 18-27.

Since before the founding, our nation's state legislatures have categorically disarmed groups judged too dangerous to be able to safely or responsibly bear arms. As summarized by then-Judge Amy Coney Barrett, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." ***Kanter v. Barr***, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). In the pre-founding era, Catholics were disarmed for refusing to swear allegiance to the sovereign or independent states, while in the founding-era, slaves and Native Americans were similarly prohibited from possessing firearms because they were perceived as "immediate threats to public safety and stability[.]" ***See id.*** at 457-58 (citations omitted).

In the 19th century, as guns became more dangerous and accessible, legislatures enacted a variety of prohibitions of the sale and/or the possession

of guns by, inter alia, "tramps" or "vagrants,"[18] persons of unsound mind,[19] and intoxicated persons.[20]  At least 29 jurisdictions limited the sale of firearms to, or the possession of firearms by, individuals below a set age.[21]

---

[18] **See** Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[19] **See** Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[20] **See** Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

[21] **See** Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio
*(Footnote Continued Next Page)*

Aside from legislative prohibitions on certain groups purchasing and/or possessing firearms, the founding-era treatment of 18-to-20-year-olds as minors is likewise weighty evidence of a historical tradition. The founding "generation shared the view that minors lacked the reason and judgment necessary to be trusted with legal rights[,]" and that, accordingly, "infants were subject to the 'power' of their parents until they reached age 21." *See National Rifle Association v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025), citing 1 William Blackstone, Commentaries on the Laws of England, at 452-53 (1871). Among the legal rights minors lacked at the time of the founding were the right to enter into contracts or sue without joining their guardian. *See Lara*, 125 F.4th at 449 (Restrepo, J., dissenting). Further, when founding-era youths went off to college, universities, standing in loco parentis, often prohibited students from carrying firearms both on and off campus. *See id.* at 450–51 (discussing founding-era weapons bans at Yale University, University of Georgia, University of North Carolina, and University of Virginia). This understanding of the legal status of minors at the founding and the restrictions on bearing arms to which they were subject lends itself to the

---

Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

conclusion that our nation has a historical tradition of restricting the rights of those aged 18 to 20.

Williams' argument against section 6109's constitutionality relies on **Evanchick** and the Second Militia Act of 1792, § 1.[22] However, this Court is not bound by the Third Circuit's decisions. **See Werner**, 799 A.2d at 782 (providing federal court decisions other than those of United States Supreme Court not binding on this Court). Therefore, the outcome in **Evanchick**, wherein a panel of the Third Circuit held section 6109 unconstitutional, is not determinative in this case.

As for the Second Militia Act, Williams conflates a legal obligation or duty imposed on a citizen with a legal right. The Second Militia Act required all "free[,] able-bodied[,] white male citizen[s] . . . who [are] or shall be of age of eighteen years, and under the age of forty-five years . . . be enrolled in the

---

[22] The Act provides, in relevant part:

> That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred[,] and provided, when called out to exercise or into service, except, that when called out on company days to exercise only, he may appear without a knapsack.

Second Militia Act of 1792, § 1.

militia . . . [and] provide himself with a good musket or firelock . . . or with a good rifle[.]" Second Militia Act of 1792. Williams claims that this requirement shows that "18-20[-]year[-]olds were expect[ed] to supply (i.e., possess) their own arms and transport (i.e., carry) them when called to muster for militia duty." Appellant's Brief, at 40. However, as discussed above, an obligation is not the same thing as a right—an individual's duty to do something does not mean they have a corresponding, unassailable right to do that thing.

Additional context regarding the manner in which states effectuated the Second Militia Act's requirement that individuals provide their own arms further erodes support for Williams' conclusion. Given the limitations on the legal status of individuals under the age of 21, discussed **supra**, states enacted laws to address minors' inability to procure the required firearms for their service. These laws took various forms: Pennsylvania and Delaware exempted minors entirely from the requirement to provide their own firearms; seven states required parents to acquire firearms for their sons' militia service; and twelve states made parents legally liable if their minor children did not appear for service with the requisite firearms. **See Bondi**, 133 F.4th at 1119–20 (listing statutes). "By 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents to provide minors with firearms for militia service." **See id.** at 1120 (citation omitted). These supplemental laws are

indicative of a founding-era assumption that minors were restricted in their access to firearms.

Going even further, in the latter-half of the nineteenth century, twenty jurisdictions passed laws restricting firearm access for minors. *See id.* at 1121 (listing statutes). Fifteen jurisdictions "prohibited selling, loaning, or giving dangerous weapons, including pistols," to individuals younger than 21. *Id.* Separately, Kansas went as far as prohibiting individuals younger than 21 from possessing pistols and "other dangerous weapon[s,]" and Nevada prohibited them from "wear[ing] or carry[ing] . . . dangerous or deadly weapons[,]" such as pistols. *See id.* (citations omitted).

Based upon this history of both common law and statutory restrictions on access to firearms by minors, among other groups, from the pre-founding-era through the latter half of the 19th-century, we find that a national historical tradition exists of restricting firearm access to individuals deemed unable to responsibly bear arms, particularly 18-to-20-year-olds. The "how" and "why" of these laws and section 6109 are likewise analogous. The restrictions burden the right to access and possess firearms (the "how") because the defined group—here, 18-to-20-year-olds—has been judged too dangerous to allow such access (the "why").[23] Therefore, it follows that section 6109 is constitutional under the standard set out in *Bruen*.

_____

[23] Moreover, as to the "why," Pennsylvania's legislature faces "unprecedented societal concerns [and] dramatic technological changes" that historians agree
*(Footnote Continued Next Page)*

Turning to section 6106, Williams alleges the Commonwealth cannot meet its burden "because there are no historical analogues to a licensing scheme like [s]ection 6106[,]" i.e., prohibiting the carrying of a firearm in a vehicle. Appellee's Brief, at 20. Williams points out that, prior to 1931, "few laws in the Commonwealth [] prohibited the carrying of firearms in general, nor did those laws require obtaining a license to do so." *Id.* at 30. Further, he claims that laws prior to 1931 "set no prohibition[s] or licensing requirements for carrying in the available forms of transportation at the time, such as wagons, carriages, railroad cars, and on horseback." *Id.*

The Commonwealth notes at the outset of its argument regarding section 6109 that most of its citations apply to the concealed carrying of weapons, which it avers are apt because "these laws are directly analogous to licensing the carrying of firearms in vehicles: carrying a firearm in a vehicle allows for many of the same advantages as carrying it concealed on one's person, and presents many of the same dangers, and thus can be licensed accordingly."[24] *See* Commonwealth's Brief, at 18 n.4. We agree.

_____

the founding-generation legislatures were not burdened by, and, therefore, the analysis requires "a more nuanced approach" when drawing analogies. *See Bruen*, 597 U.S. at 27; *see also Lara*, 130 F.4th at 72 (Krause, J., dissenting) (contrasting present-day interpersonal gun violence with lack thereof in founding era).

[24] Aside from its argument on the merits, the Commonwealth also claims that Williams has waived a facial challenge against section 6106 by not raising it before the trial court. *See* Commonwealth's Brief, at 11-12. However, *(Footnote Continued Next Page)*

- 23 -

While Williams makes a compelling case that our historical tradition is rather quiet on the question of carrying firearms in "the available forms of transportation in the 19th century," Appellant's Brief, at 31, we do not need a regulation of that sort to find section 6106 constitutional. ***See Bruen***, 597 U.S. at 3 (stating courts need not find "dead ringer" to hold law constitutional). This reasoning follows a "use it or lose it view of legislative authority"—it assumes that late-18th and early-19th century legislatures constitutionally could not have legislated in this fashion merely because they did not. ***See Rahimi***, 602 U.S. at 739–40 (Barrett, J., concurring) (internal quotation omitted). This rationale, however, is "flawed" and forces upon present day-legislatures "a law trapped in amber." ***Id.*** Such an approach would turn any Second Amendment analysis into a "historical inquiry so exacting as to be useless, a too-sensitive alarm that sounds whenever a regulation did not exist in an essentially identical form at the founding." ***Id.*** at 702–03 (Sotomayor, J., concurring).

Instead, this Court need only, and does, consider section 6106 "relevantly similar" to the many "public-carry restrictions [which] proliferate[d]" after the ratification of the Second Amendment in 1791. ***See***

---

Williams' claim is an as-applied challenge. ***See*** Appellant's Brief, at 21 ("The instant challenge is that [s]ection 6106 is unconstitutional as applied to [] Williams under the Second Amendment."); ***see also*** Omnibus Pretrial Motion, 9/12/23 ("[Appellant] respectfully requests that this Honorable Court . . . find that [section] 6106 . . . is unconstitutional as applied to him[.]"). Because Williams brings an as-applied challenge and not a facial challenge, the Commonwealth's waiver argument is meritless.

*Bruen*, 597 U.S. at 50. Carrying a weapon concealed on one's person versus storing it in the glovebox or center console is, to this Court, a distinction without a difference. If anything, the additional number of spaces in which to store a firearm within a vehicle, the variety of firearms that can be carried within a vehicle as opposed to concealed on one's person, and the portability provided by modern vehicles all weigh in favor of section 6106 applying with greater force to possession within a vehicle than possession on one's person.[25] Therefore, as section 6106 can then be viewed through the same lens as a standard licensing scheme for concealed carry, *Bruen* is controlling, and section 6106's prohibition on unlicensed individuals possessing a firearm in a vehicle is similarly constitutional. *See id.* at 80 ("[T]he 43 states that employ objective[,] shall-issue licensing regimes for carrying handguns for self-

_____

[25] The criminal law concept of "constructive possession" is a helpful example here. Relevant sections of Pennsylvania's Controlled Substance, Drug, Device and Cosmetic Act prohibit "possessing a controlled or counterfeit substance[,]" *see* 35 P.S. § 780-113(a)(16), and the "possession with intent to use[] drug paraphernalia[.]" *See id.* at § 780-113(a)(32). There are numerous Pennsylvania cases upholding convictions under these or similar sections wherein the convicted individual "constructively possessed" the illegal substance within their vehicle, i.e., had it in their car with them, though not directly on their person, and exercised "conscious dominion" over it. *See Commonwealth v. Sweitzer*, 177 A.3d 253, 258 (Pa. Super. 2017); *see also Commonwealth v. Dix*, 207 A.3d 383, 390 (Pa. Super. 2019) (sustaining conviction under section 780-113(a)(30) for possession with intent to deliver under theory of constructive possession wherein defendant had narcotics in vehicle); *Commonwealth v. Griffin*, 326 A.2d 554, 556 (Pa. Super. 1974) (upholding conviction for possession of narcotics in vehicle under theory of constructive possession). Therefore, akin to Pennsylvania's criminal controlled substance law jurisprudence, we consider the possession of a firearm in a vehicle, as opposed to on one's person, nearly indistinguishable.

defense may continue to do so.") (Kavanaugh, J., concurring); *see also Heller*, 554 U.S. at 626 ("[T]he majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.").

Williams' last argument, that Article I, Section 21 of the Pennsylvania Constitution provides greater protection than the Federal Constitution, is also unavailing. This Court has at least twice had the recent opportunity to take up the question of whether the Pennsylvania Constitution's arms-bearing provision provides greater protection than its federal counterpart. In both instances, this Court has declined to hold that it does. *See Commonwealth v. Mead*, 326 A.3d 1006, 1015 (Pa. Super. 2024) ("[Pennsylvania's] courts have repeatedly treated Article I, Section 21 as not providing any greater restriction on government firearm regulations than the Second Amendment."); *Commonwealth v. Nieves-Crespo*, 321 A.3d 965, *13 (Pa. Super. 2024) (Table) (finding arms-bearing provisions of Pennsylvania and United States Constitutions "offer the same protection").

Based on the foregoing, we hold that, as applied to Williams, sections 6106 and 6109 are constitutional and do not impermissibly infringe upon his right to bear arms under either the United States or Pennsylvania Constitutions.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/01/2025